## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
**PRIETALACOSTE@GMAIL.COM,**
**PRIETALACOSTA83@GMAIL.COM,**
**MAMITARETATEAMO@GMAIL.COM,**
STORED AT PREMISES CONTROLLED BY
**APPLE INC.**

Case No. 26-mj-272

### AFFIDAVIT OF PROBABLE CAUSE
### IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Ryan Scanlan, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510(7). That is, an officer of the United States

who is empowered by law to conduct investigations of, and to make arrests for offenses

enumerated in Title 18, United States Code, Section 2516.

2.      I am employed as a Special Agent with the Drug Enforcement Administration

("DEA") in Philadelphia, Pennsylvania. I am currently assigned to the Philadelphia Division

Office Enforcement Group 42, which investigates narcotics trafficking. I have been employed as

a DEA Special Agent since January 2022. While employed by the DEA, I have received

specialized training from the DEA Academy at Quantico, Virginia, in the investigation and

identification of narcotics traffickers, and have participated in investigations, which have led to

the arrests of narcotics traffickers. I have conducted physical and electronic surveillance,

debriefed confidential sources, interviewed witnesses, worked with federal, state, and local

narcotic agents and officers, executed search warrants, analyzed telephone toll records, and

written affidavits used in support of applications for federal Title III interceptions, and I have led

the investigations that utilized those Title III interceptions.

3.      Prior to joining the DEA, I worked for the United States Capitol Police ("USCP")

in Washington, DC as a uniformed police officer. During my time in this role, I provided

security services to protect Congress, employees, and visitors, and property under the jurisdiction

of Congress from all threats of civil disorder or criminal activity. I patrolled the USCP

jurisdiction in marked police vehicles responding to calls, violations, and duress alarms relating

to crimes in progress or discovered, enforced traffic regulations, assisted at accident scenes, and

maintained a law enforcement presence, participated in preliminary investigations, participated

in rapid response operations for civil disturbances or emergency situations, prepared reports, and

testified in court.

4.      From training and experience during my time with the DEA, I have become

familiar with the methods and techniques associated with the distribution of narcotics, the

laundering of drug proceeds, and the organization of drug conspiracies and drug trafficking

organizations. I am familiar with the clandestine manner in which cocaine, crack, heroin,

marijuana, methamphetamine, and other controlled substances are manufactured, sold,

distributed, and used. I am also familiar with prices, slang terminology, codes, and mechanisms

used in association with the distribution and use of illicit narcotics.

5.      From my experience and training, I have learned, that: (a) drug traffickers rarely,

if ever, refer to illegal drugs by name; instead, to conceal the true nature of their illegal activities

and to prevent detection by law enforcement, they refer to the drugs and drug quantities using

seemingly generic terms; (b) narcotics traffickers frequently use cellular telephones, and other

communication devices to further their illegal activities, by remaining in constant or ready

communication with one another without restricting either party to a particular telephone or location at which, they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to text messaging services on cellular phones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the cell phone. I am aware that those involved in illegal drug operations often subscribe their telephones and cellular telephones in the names of others or purchase pre-paid cellular telephones that require the purchaser to provide little or no identifying information to utilize the phone. This is done in an effort to avoid detection of law enforcement. Additionally, I am aware that drug traffickers often use multiple cellular telephones to conduct illegal narcotics activity. Even more, individuals involved in the illicit distribution of controlled substances attempt to thwart electronic surveillance and conceal their criminal activities using multiple cellular telephones and by changing their cellular telephone numbers frequently.

## PURPOSE OF AFFIDAVIT

6.      I make this affidavit in support of application for a search warrant for information associated with certain accounts, PRIETALACOSTE@GMAIL.COM, PRIETALACOSTA83@GMAIL.COM ("SUBJECT ACCOUNT-1") and MAMITARETATEAMO@GMAIL.COM ("SUBJECT ACCOUNT-2") that are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to

disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

7.      As set forth below, there is probable cause to believe that SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 have been used in the commission of crimes, including violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances, and conspiracy to commit controlled substance offenses). Because this affidavit is submitted for the limited purpose stated above, it does not include every fact known to me about the investigation, only those establishing probable cause to search the contents of SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2.

## JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i) and "is in a district in which the provider is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii).

## FACTS ESTABLISHING PROBABLE CAUSE

9.      In September 2025, the DEA Philadelphia Field Division ("DEA Philadelphia") Group 42 began an investigation into Griselle LACOSTA-FRANCO after receiving information from the Philadelphia Police regarding LACOSTA-FRANCO.

10.    On September 22, 2025, at approximately 10:33 a.m., a license plate reader on Philadelphia Police Cruiser #1533 was driving in front of 3444 Shelmire Avenue, Philadelphia, PA. The license plate reader alerted to law enforcement that the 2021 silver Dodge Ram truck with Pennsylvania license plate #ZXH-3735 (VIN# 1C6SRFFT1MN597193) was a stolen motor vehicle. The Dodge Ram was parallel parked on the side of the road in front of 3444 Shelmire Avenue, Philadelphia, PA.

11.    Philadelphia Police Department plain clothes officers, Officer Sean Kennelly and Officer Stephen Burgoon, responded to the area of 3444 Shelmire Avenue, Philadelphia, PA.

12.    Officer Kennelly and Officer Burgoon observed the Dodge Ram unoccupied, parked on the side of the road, parallel parked in front of 3444 Shelmire Avenue, Philadelphia, PA.

13.    A short time later, Officer Kennelly and Officer Burgoon observed a female, later identified as Griselle LACOSTA-FRANCO, placing an object in the rear passenger's seat of the truck. Officer Kennelly and Officer Burgoon observed LACOSTA-FRANCO get into the front driver's seat of the Dodge Ram and turn the Dodge Ram on. Officer Kennelly and Officer Burgoon called two uniform patrol officers in the area to respond.

14.    At approximately 11:30 a.m., Officer Clemens and Officer Morris arrived in the area and approached the Dodge Ram. Officer Clemens and Officer Morris observed LACOSTA-FRANCO sitting in the front driver's seat of the Dodge Ram. She was the only person in or around the vehicle. Officer Clemens and Officer Morris observed LACOSTA-FRANCO exit the Dodge Ram and stand outside of the driver's side door. LACOSTA-FRANCO was wearing blue latex gloves on her hands. Officers attempted to detain LACOSTA-FRANCO, and she resisted those efforts.

15.     LACOSTA-FRANCO repeatedly slipped her handcuffs—meaning she repeatedly moved them down her wrists and off of her hands—and attempted to conceal items in her pockets, including one navy-blue colored Apple iPhone and one Apple iPhone in a black case. At this time, LACOSTA-FRANCO was placed under arrest by Officer Clemens and Officer Morris.

16.     Officer Horton conducted a search of LACOSTA-FRANCO and recovered approximately fifty blue glassine baggies containing fentanyl, a vial containing heroin, approximately ten suboxone strips, multiple prescription pills, a container of "crack" cocaine, one navy-blue colored Apple iPhone and one Apple iPhone in a black case (collectively, the "Cellular Telephones").

17.     Officer Kennelly notified the proper chain of command. Detective Gregory Kravitz reached out to Phoenixville Police Department. Phoenixville Police Department declined to respond to the scene due to LACOSTA-FRANCO being arrested with the Dodge Ram (the police department had originally asked all law enforcement to hold the vehicle for latent prints if found) but requested that Philadelphia Police Department conduct an inventory search to inventory the contents of the vehicle, consistent with PPD policy. Officers Kennelly and Burgoon conducted an inventory search of the Dodge Ram and located a gray plastic bag on the front driver's seat of the Dodge Ram. The gray plastic bag contained a clear, heat-sealed bag with a white substance inside and another clear heat-sealed bag with a brown substance inside. The DEA Northeast Laboratory determined that the white substance was heroin and weighed approximately 906.1 grams (+/-0.2 grams).  The DEA Northeast Laboratory determined that the brown substance was heroin and weighed approximately 595.3 grams (+/-0.2 grams).

18.     Officer Kennelly located a navy-blue backpack in the rear passenger's seat of the Dodge Ram. The backpack contained multiple black plastic bags. Inside of the black plastic bags were blue latex gloves which were consistent with the blue latex gloves LACOSTA-FRANCO was wearing at the time of her arrest, a plastic bag with a brown powdery substance inside of it, later determined to be AnaSed, and a Pennsylvania driver's license #30451867 with name Miguel ROMAN Jr., date of birth 11/14/1989. Officers located another black bag inside the plastic bags with a white powdery substance inside of it. The DEA Northeast Laboratory determined that the white substance was cocaine and weighed approximately 17.2 grams (+/- 0.2 grams). The other substances seized from the trunk of the Dodge Ram were tested by the DEA Northeast Laboratory and the substances identified were as follows O6-Monocetylmorphine approximately 49.9 grams (+/- 0.2 grams), fentanyl approximately 52.5 grams (+/- 0.2 grams), and approximately 10.189 grams (+/-0.002 grams) fentanyl. Officers additionally recovered a pill bottle with the name "Rosa RIVERA" listed as the patient.

19.     Inside of the black plastic bag, officers also recovered new and unused drug packaging materials, "SOS" stamped baggies, glassine baggies, and rubber bands. There were also cardboard boxes with blue glassine baggies, consistent with the glassine baggies found on LACOSTA-FRANCO at the time of her arrest, and three digital scales in the bag.

20.     Philadelphia police officers spoke with the original owner of the Dodge Ram. The owner stated that on September 15, 2025, two individuals, R.B.D.S. and S.F., took his Dodge Ram without his permission. He denied ownership of the narcotics that officers found in the Dodge Ram and told police that LACOSTA-FRANCO did not have permission to use his vehicle.

21.     Investigators do not know the telephone numbers assigned to the Cellular Telephones that were recovered from LACOSTA-FRANCO's person on September 22, 2025, as described above.  However, based on my training and experience, I know that it is common for drug traffickers to utilize different cellular telephones or devices to conduct their drug trafficking activities in order to avoid law enforcement detection.

## GRAND JURY INDICMENT OF LACOSTA-FRANCO

22.     On January 15, 2026, a federal grand jury in the Eastern District of Pennsylvania returned an indictment charging LACOSTA-FRANCO with one count of Possession with intent to distribute 1000 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count I), and one count of Possession with intent to distribute fentanyl, heroin and cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count II).  A federal arrest warrant was issued at that time, and LACOSTA-FRANCO is currently being held at the Federal Detention Center in Philadelphia, pending trial.

## APPROVAL OF SEARCH WARRANT FOR THE CELLULAR TELEPHONES AND IDENTIFICATION OF SUBJECT ACCOUNT-1 AND SUBJECT ACCOUNT-2

23.     On February 4, 2026, the Honorable Carol Sandra Moore Wells, Magistrate Judge in the Eastern District of Pennsylvania, issued a search warrant (26-MJ-194) to search the Cellular Telephones that were recovered from LACOSTA-FRANCO's person on September 22, 2025, as described above.  On February 4, 2026, investigators executed the search warrant on the Cellular Telephones.  Investigators utilized law enforcement tools to try to crack the passcode for the cellular devices.  The law enforcement tools are not available at this time to try to crack the passcode for the iPhone operating system each iPhone is running.  However, investigators were able to pull the SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 identifiers for the

Cellular Telephones and an internal memory dump for the phones was completed, which did not provide a lot of information.

## REQUEST TO SEARCH SUBJECT ACCOUNT-1 AND SUBJECT ACCOUNT-2 ELECTRONIC DEVICES

24.     There is probable cause to believe that the requested records from SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 will aid in the investigation discussed above for the potential violations of the enumerated offenses.

25.     As stated above, at the time of her arrest on September 22, 2025, LACOSTA-FRANCO was in possession of the Cellular Telephones and attempted to conceal the Cellular Telephones from law enforcement.  SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 were pulled from the Cellular Telephones by investigators.

26.     Based on my training and experience, I know drug traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their drug transactions and may discuss the use of firearms to protect their product and proceeds or to otherwise further their criminal activities. For example, drug traffickers often store contacts lists, address books, calendars, photographs, videos, audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their drug trafficking activities.

27.     I also know that those involved in drug trafficking communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in drug trafficking communicate with associates using cellular telephones

and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

28.     An examination of the records maintained by Apple Inc.'s iCloud service could also document communications between other actors involved in these incidents. Only the identity of Griselle LACOSTA-FRANCO has been identified by investigators.

29.     I also know, based on my training and experience, that it is common for individuals to take group photographs with their cellular phones whether or not they share them privately in text/instant message(s) or publicly on social media. Photo evidence showing one or more of the actors together could provide valuable association evidence linking them together. I know it is common for individuals who possess and traffic in controlled substances to arrange for the purchase, sale, or delivery of the controlled substances via cellular phone applications including phone calls, text/instant messages, photo messages, and social media applications (e.g. Instagram direct message, Facebook Messenger) commonly used on cell phones.

30.     I also know it is common for criminal actors to discuss the planning, commission, or sale of controlled substances via their cellular telephones, and there is probable cause to believe that evidence of those communications is present on SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2, especially where, as here, LACOSTA-FRANCO was in possession of the Cellular Telephones and attempted to conceal the Cellular Telephones at the time of her arrest on September 22, 2025, and SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 were pulled from the Cellular Telephones by investigators.

31.    There is probable cause to believe that at least some of the same evidence expected to be present on the Cellular Telephones that were recovered from Griselle LACOSTA-FRANCO could be backed up to the associated Apple iCloud account, for SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2. I know from my training and experience, along with that of other investigators familiar with this investigation, that available forensic software is sometimes unable to recover the entirety of a mobile device's contents during a forensic examination. I also know that information that may not be accessible or recoverable by forensic software may nevertheless be backed up or retained in mobile cloud storage like Apple iCloud and SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2.

## BACKGROUND CONCERNING APPLE[1]

32.    Apple is a United States company that produces iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

33.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

    a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

b.  iMessage and FaceTime allow users of Apple devices to communicate in
real-time. iMessage enables users of Apple devices to exchange instant
messages ("iMessages") containing text photos, videos, locations, and
contacts, while FaceTime enables those users to conduct audio and video
calls.

c.  iCloud is cloud storage and cloud computing service from Apple that
allows users to interact with Apple's servers to utilize iCloud-connected
services to create, store, access, share, and synchronize data on Apple
devices or via icloud.com on any Internet-connected device. For example,
iCloud Mail enables a user to access Apple-provided email accounts on
multiple Apple devices and on iCloud.com. iCloud Photo Library and My
Photo Stream can be used to store and manage images and videos taken
from Apple devices, and iCloud Photo Sharing allows the user to share
those images and videos with other Apple subscribers. iCloud Drive can
be used to store presentations, spreadsheets, and other documents. iCloud
Tabs and bookmarks enable iCloud to be used to synchronize bookmarks
and webpages opened in the Safari web browsers on all of the user's
Apple devices. iCloud Backup allows users to create a backup of their
device data. iWork Apps, a suite of productivity apps (Pages, Numbers,
Keynote, and Notes), enables iCloud to be used to create, store, and share
documents, spreadsheets, and presentations. iCloud Keychain enables a
user to keep website username and passwords, credit card information, and
Wi-Fi network information synchronized across multiple Apple devices.

d.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.  Find My allows owners of Apple devices to remotely identify and track location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.  App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

34.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only

after the user access and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

35.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

36.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

37.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

38.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored

on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

39.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

40.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Here, LACOSTA-FRANCO had on her person the Cellular Telephones at the time of her arrest on September 22, 2025, attempted to conceal the Cellular Telephones from law enforcement, and investigators were able to pull SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 from the Cellular Telephones.

41.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an

example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

42.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crime under investigation. As stated above, drug traffickers often store contacts lists, address books, calendars, photographs, videos, audio files, text messages, call logs, and voice mails in their electronic devices, such as the Cellular Telephones, which could be backed up to the associated Apple iCloud account, for SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2.

44.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and

experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

45.    Based upon the foregoing facts, I submit that there is probable cause to believe that the fruits and/or evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a)(1) and 846, will be found in the information stored in SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2, identified in Attachment A-1 and A-2. SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 have remained in secure custody of the Philadelphia Police Department since the arrest of LACOSTA-FRANCO on September 22, 2025, before being transferred to DEA Philadelphia Field Division Group 42 on October 13, 2025.

46.    Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. I submit that this affidavit supports probable cause for the requested search warrants authorizing the examination of the items described in Attachment A-1 and A-2 to seek the items described in Attachment B.

47.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.  The government will execute these warrants by serving the warrants on Apple.  Because the warrants will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

48.     I declare under penalty of perjury that the foregoing is true and correct to the best of his knowledge and belief.

Respectfully submitted,

_/s/_____
Ryan Scanlan
Special Agent
Drug Enforcement Administration

Sworn and Subscribed before me by telephone
this _____ day of February, 2026:


_____
HONORABLE SCOTT W. REID
United States Magistrate Judge

**ATTACHMENT A-1**
**Property to be Searched**

This warrant applies to information associated with Apple ID

PRIETALACOSTE@GMAIL.COM, PRIETALACOSTA83@GMAIL.COM, the SUBJECT

ACCOUNT-1, pulled from one navy-blue colored Apple iPhone and one Apple iPhone in a

black case that were recovered from GRISELLE LACOSTA-FRANCO on September 22, 2025,

that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company

headquartered at One Apple Park Way, Cupertino, California.

**ATTACHMENT A-2**
**Property to be Searched**

This warrant applies to information associated with Apple ID

MAMITARETATEAMO@GMAIL.COM, the SUBJECT ACCOUNT-2, pulled from one navy-

blue colored Apple iPhone and one Apple iPhone in a black case that were recovered from

GRISELLE LACOSTA-FRANCO on September 22, 2025, that is stored at premises owned,

maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park

Way, Cupertino, California.

**ATTACHMENT B**
**Particular Things to be Seized**

All records contained in SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 for the

time period from August 22, 2025 through September 22, 2025 that relate to violations of Title

21, United States Code, Sections 841(a)(1), and 846, including:

**I.      Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A-1 and A-2 is within the

possession, custody, or control of Apple, regardless of whether such information is located

within or outside of the United States, and including any emails, records, files, logs, or

information that has been deleted but is still available to Apple, or has been preserved pursuant

to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following

information to the government for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers, email addresses (including primary,

alternate, rescue, and notification email addresses, and verification information for each email

address), the date on which the account was created, the length of service, the IP address used to

register the account, account status, associated devices, methods of connecting, and means and

source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in

connection with, the account (including all current and past trusted or authorized iOS devices

and computers, and any devices used to access Apple services), including serial numbers, Unique

Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers

("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers

("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),

Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber

Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile

Station Equipment Identities ("IMEI");

      c.    The contents of all emails associated with the account between August 22, 2025,

and September 22, 2025, including stored or preserved copies of emails sent to and from the

account (including all draft emails and deleted emails), the source and destination addresses

associated with each email, the date and time at which each email was sent, the size and length of

each email, and the true and accurate header information including the actual IP addresses of the

sender and the recipient of the emails, and all attachments;

      d.    The contents of all instant messages associated with the account between August

22, 2025, and September 22, 2025, including stored or preserved copies of instant messages

(including iMessages, SMS messages, and MMS messages) sent to and from the account

(including all draft and deleted messages), the source and destination account or phone number

associated with each instant message, the date and time at which each instant message was sent,

the size and length of each instant message, the actual IP addresses of the sender and the

recipient of each instant message, and the media, if any, attached to each instant message;

      e.    The contents of all files and other records stored on iCloud, including all iOS

device backups, all Apple and third-party app data, all files and other records related to iCloud

Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork

(including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud

Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.        All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.        All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.        All records pertaining to the types of service used;

i.        All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.        All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances, and conspiracy to commit controlled substance offenses). those violations occurring on September 22, 2025, including, for each account, information pertaining to the following matters, between August 22, 2025, and September 22, 2025:

a.      Information that constitutes evidence of the identification or location of the user(s) of the SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2;

b.      Information that constitutes evidence concerning persons who (i) collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the Subject Offenses; or (ii) communicated with the target accounts about matters relating to the Subject Offenses, including records that help reveal their identities and whereabouts;

c.      The identity of the person(s) who communicated with the target accounts or any associated user ID about matters relating to the laundering of funds;

d.      Information that constitutes evidence indicating the target accounts user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the Subject Offenses;

e.      Information that constitutes evidence concerning how and when the target accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the Subject Offenses and to the Account user;

f.      All banking and business records;

g.      Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers;

h.      Information that constitutes evidence related to controlled substances, including the diversion, transportation, shipment, smuggling, storage, sale and/or distribution.

i.      Information that constitutes evidence regarding the transportation or transmission of funds that have been derived from the commission of the Subject Offenses;

j.      Information that constitutes evidence transportation, transmission, or transfer of funds that are intended to be used to promote, conceal, or support unlawful activity; and

k.      All communications between/among the owners of SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 and others regarding the Subject Offenses.